## Hicks et al. v. Oak's Administrator et al.

(Decided February 11, 1930.)

28

WINSLOW & HOWE and W. C. MARSHALL for appellants.

J. A. DONALDSON & SONS for appellees.

Opinion of the Court by Judge Willis—Affirming on appeal and reversing on cross-appeal.

This case is unique in some of its particulars and unusual in all of its features. James Oak, a widower 65 years old, with five grown children, all married, entered into a prenuptial contract with Amanda Ford, a childless widow of about the same age, whereby they agreed that, in the event of a marriage between them, each should retain the property then owned, unaffected by the marital relation. The contract contained this provision:

> "If said parties should marry, as now intended, it is hereby agreed and understood that each shall share and share alike the net proceeds of the property of both jointly, and the joint care and custody thereof and labor thereon, and all moneys made by James Oak or Amanda Ford, or both during such time as they shall live together as man and wife shall be the joint property of said Oak and Ford. The one-half to one and the one-half to the other. In other words, it shall be treated as a partnership,

each retaining in his own name such property as they may own, but are to divide the profits thereon.''

The marriage speedily followed, and the parties lived together as husband and wife until April 18, 1925, upon which date Amanda Oak died. James Oak was appointed administrator of the estate, and there came into his hands about $1,676. On June 21, 1926, an action was filed against James Oak, as administrator and individually, by Thomas Hicks, a brother of Amanda Oak, Lizzie Williams, a sister, the five children of Alice Hall, a deceased sister, and the three children of a deceased brother, claiming to be all the heirs and distributees of Amanda Oak. They sought to recover a large sum of money, on the ground that the partnership created by the prenuptial contract had not been settled, and that James Oak individually was indebted to the estate of Amanda Oak for one-half of the net profits realized by him during the 10 years the marriage relation existed. The petition was amended several times, and the defensive pleadings were likewise frequently amended. The case was referred to the master commissioner, with directions to hear proof, audit, state, and settle the accounts of James Oak, as administrator of Amanda Oak, and also the accounts alleged to be owing by James Oak to Amanda Oak under the prenuptial agreement. The commissioner heard proof and reported a settlement of the accounts of the administrator, but stated that he was unable accurately to state the accounts of the partnership.

The case was heard by the court on exceptions to the commissioner's report, and a judgment was rendered finding, first, that the prenuptial agreement was terminated on October 13, 1922; second, that prior to the termination of the contract James Oak realized gross profits for the partnership amounting to $27,568.04, and incurred expenses amounting to $13,548.50, leaving on October 13, 1922 a balance of net profits of $14,019.54; third that the estate of Amanda Oak was entitled to one-half thereof, subject to certain credits; fourth, that the abrogation of the contract which occurred October 13, 1922, restored the parties to their respective rights in the property of each other, and upon the death of the wife the husband was entitled to one-half of her surplus personalty, including her one-half interest in the partnership net profits; fifth, that, after allowing the credits

to James (Oak as surviving husband, a net balance of $3,948.53, was due the plaintiffs, for which judgment was rendered. Both sides to the controversy excepted to the judgment, and this appeal was taken by the heirs. James Oak has been granted a cross-appeal, and the whole case is before us for determination.

It is insisted for appellants that the partnership agreement continued in force until the death of Amanda Oak, and that the plaintiffs, as her heirs, are entitled to recover one-half of the entire property owned by James Oak, less what he had when the contract was made. It is said that the net profits under the contract can be ascertained by finding the value of his property on the date of the marriage and its value on the date of the death of Amanda Oak, the difference being the net profits of the partnership. The contention proceeds upon the theory that all of the property owned by James Oak when his wife died, except what he had on the date of the marriage, had been accumulated during the 10 years of their married life, and that under the contract his wife was entitled to one-half of it. Proceeding upon the same theory, it is argued for Oak that there were no net profits, since the property owned by Oak at the date of his wife's death was of less value than it was at the date of the marriage, showing a net loss in the 10 years of operation. The record is very large, and almost every item of property owned by Oak, or dealt with by him, is the subject of controversy, either as to its value, or as to the source or time of its acquisition.

It is not apparent how the court arrived at the figures upon which the judgment was predicated. It conformed to the calculations of neither party. But these differences need not be resolved, since there is another factor that is determinative of the dispute. A defense relied upon by James Oak was the fact that on October 13, 1922, a new arrangement was entered into by the parties, superseding and abrogating the prenuptial contract. James Oak and wife, Amanda Oak, on or about that date executed and delivered, to the five children of Mr. Oak by a previous marriage, deeds of conveyance transferring to them all the real estate owned by Oak, except about 25 acres. Each of the five deeds contained a covenant requiring the grantee to pay $100 per year to James Oak during his life. The deed to Jesse Oak also required payment of $1,160.35, with interest at 6 per cent. per

annum from January 1, 1923, to his father, and the one to Ora Oak obligated him to pay his father $457.75, in addition to the annuity. Two of the deeds were dated October 13, 1922, two of them October 14, 1922, and one was dated October 11, 1922. The deed to Henry M. Oak required the payment of $1,000 and the annuity mentioned.

The appellants argue that these deeds had no effect whatever, except to extinguish the right of Amanda Oak thereafter to share in the earnings of the property conveyed, and that the partnership agreement continued unaffected as to other earnings. Stevenson v. Renardet, 83 Miss, 392, 35 So. 576; Martin v. Collision, 266 Ill. 172, 107 N. E. 257. On the other hand, Oak contends that the antenuptial agreement was entirely abrogated and a complete settlement made, by which each party was restored to full martial rights, and the relationship and rights growing out of the agreement were terminated and settled. 30 C. J. secs. 221, 222, pp. 656, 657. The master commissioner stated that he did not consider the action of Amanda Oak in joining in the deeds as being conclusive proof that all accounts between herself and husband were settled up to that time. The circuit court found that the antenuptial agreement was abrogated, not pro tanto, but in toto, and yet held that the partnership affairs prior to the abrogation were unsettled. The case for Oak does not depend on mere deductions to be derived from the execution of the deeds to the five children. It was proven by the attorney who prepared the deeds that it was expressly agreed and understood that the partnership agreement was terminated, and that by virtue thereof neither party owed the other anything. The substance of the abrogation agreement was proven by the three sons of James Oak, by his two daughters, and also by a daughter-in-law and a son-in-law.

It is argued that the testimony may not be accepted, because of the potential interest of the witnesses. There is no proof whatever to the contrary. The very transaction itself, coupled with the conveyances, strongly indicates an abrogation of the prenuptial agreement. The surrounding circumstances likewise tend to that conclusion. The parties prior to marriage entered into the agreement for their mutual benefit and protection. They had lived together as husband and wife for more than seven years. They were both advanced in years, and it was reasonable for Mrs. Oak, after an experience of

seven years as the wife of Oak, to prefer the rights given her by the law to the uncertain results to be expected from the contract. The burden of maintaining and managing the business must have been very great. It appears without contradiction that it took Mr. Oak away from home a great deal, and, in order that they might have more leisure and companionship, the new arrangement was devised by Mrs. Oak. It is not reasonable to suppose that any part of the business transactions between them would be left unsettled, when they were taking the trouble to make such drastic changes in their business affairs. Mrs. Oak thereafter was entirely satisfied, and no complaint from her appears to have been heard. She made no subsequent claims inconsistent with a complete settlement, although she lived nearly 3 years thereafter.

Viewed from her standpoint, the new arrangement may have been more desirable. Her concern naturally was for her own comfort and security. These were assured her by the substitution of the statutory for the contractual rights, and her wish that her husband might be relieved from the exacting duties that absorbed so much of his time was realized. In any event, she made the arrangement and its legal effect may not be denied. Undoubtedly the testimony of parties who have even an indirect interest must be carefully scrutinized and cautiously accepted (Coleman v. Coleman, 142 Ky. 36, 133 S. W. 1003; Buckel v. Smith, 82 S. W. 235, 26 Ky. Law Rep. 495; Mount v. Fourth Street Bank, 156 Ky. 503, 161 S. W. 220), but the witnesses in this case were legally competent to testify to the transaction in question, and there is nothing to discredit their testimony, or to disprove the facts which the testimony tended to establish. A witness who is the child of a living party to a suit is not so interested as to be disqualified merely because he may ultimately share in the property of the litigant. 40 Cyc. 2285. The interest which will disqualify a witness must be direct and certain. "The true test of the interest of a witness is that he will either gain or lose by the direct legal operation and effect of the judgment, or that the record will be legal evidence for or against him in some other action. It must be a present, certain, and vested interest, and not an interest uncertain, remote, or contingent." Greenleaf on Evidence, vol. 1, sec. 390; New York Life Ins. Co. v. Johnson's Adm'r, 72 S. W. 762, 24 Ky. Law Rep. 1867. It is

the law in this state that a mere expectancy of a child of an inheritance in the estate of its parent constitutes no vendible or actual present interest. Hunt v. Smith, 191 Ky. 443, 230 S. W. 936, 17 A. L. R. 588; Consolidation Coal Co. v. Riddle, 198 Ky. 256, 248 S. W. 530; Snyder v. Snyder, 193 Ky. 235, 235 S. W. 743. Indeed, the appellants concede that the witnesses were competent under the letter of the law, but argue that they were disqualified by the spirit of the Civil Code of Practice (section 606, subsec. 2). The authorities are to the contrary, and the utmost effect that can be given to a relationship such as that involved here is the bearing it may have in case of conflicting evidence upon the credibility of the witnesses.

It is argued also that the pleading presenting the defense that the contract had been abrogated was inconsistent with other defenses interposed. Oak took issue with the plaintiffs from the beginning, contending that he did not make any profits, that he had settled with his wife from time to time as anything was earned, and, finally, that the contract was completely abrogated in October, 1922. Under the Civil Code a party may rely upon as many defenses as he may have, provided they are not inconsistent or mutually destructive. Civil Code of Practice sec. 113, subsec. 2. The test by which inconsistency is to be determined is to ascertain whether the proof of one of the defenses will necessarily disprove the other. Caruso v. Brown, 142 Ky. 76, 133 S. W. 948; Maverick Oil & Gas Co. v. Howell, 193 Ky. 437, 237 S. W. 40; Jones v. Whitaker, 141 Ky. 484, 133 S. W. 223; Hofgesang v. Silver, 232 Ky. 503, 23 S. W. (2d) —, decided January 21, 1930.

No inconsistency was involved in proving that no profits had been made under the contract, and that whatever was made had been divided between the partners, and that the contract had been abrogated by agreement extinguishing all rights under it. The Civil Code of Practice provides the remedy to reach inconsistent defenses which is by a motion to require an election. Civil Code of Practice, sec. 113, subsec. 4; Smith v. Ferguson, 187 Ky. 338, 219 S. W. 160; Lewis v. Durham, 205 Ky. 403, 265 S. W. 934; Brashears v. Combs, 174 Ky. 344, 192 S. W. 482; Caruso v. Brown, supra. But there was no occasion for an election here, since the defenses interposed were not inconsistent. The court first refused to permit the defense of abrogation to be made, and when

**34**

it was allowed the proof already had been taken. No request was made for an opportunity to take further testimony, but the case was then, by consent, submitted. The court, when it allowed the amendment to be filed, corrected its previous error, and no right of appellants was prejudiced by that action.

An antenuptial contract, to be valid, is required to be in writing. Ky. Stats., sec. 470; Mallory v. Mallory, 92 Ky. 316, 17 S. W. 737, 13 Ky. Law Rep. 579; Potts v. Merrit, 14 B. Mon. 406; Wesley v. Wesley, 181 Ky. 135, 204 S. W. 165; Glazebrook v. Glazebrook, 227 Ky. 628, 13 S. W. (2d) 776. Cf. Southerland v. Southerland, 5 Bush, 591. It does not follow, however, that such a contract may not be abrogated by a parol agreement. It is an established principle that a contract, although required by the statute of frauds to be in writing, may be modified, abrogated, or rescinded by a parol agreement. 6 R. C. L. p. 922, sec. 306; Kenney v. Waters, 135 Ky. 529, 122 S. W. 837; Warden v. Bennett, 145 Ky. 325, 140 S. W. 538; Murray v. Boyd, 165 Ky. 625, 177 S. W. 468; United Mining Co. v. Morton, 174 Ky. 379, 192 S. W. 79. The court here found that the contract had been abrogated, but did not give full legal effect to the finding. The consequence of abrogating the old agreement was to restore the husband and wife to their respective statutory rights and to terminate all rights under the antenuptial agreement. It necessarily follows that the appellants have no right against the appellee growing out of the abrogated agreement, but the appellee is entitled to his statutory rights as surviving husband in the property of his deceased wife.

It is said that the settlement and distribution of the wife's personal estate was accomplished by a final order, which now precludes the court from decreeing to James Oak his statutory interest in the personal estate of Amanda Oak. But such is not the result. Oak is entitled to be adjudged one-half of the surplus personalty and a life estate in one-third of the realty of his late wife. (Ky. Stats., sec. 2132). The court has control of the case and of the parties, and may make appropriate orders to effectuate the proper distribution of the estate. When the order of partial distribution was made an issue was pending as to the rights of the parties which could not be finally settled until it was ascertained whether the prenuptial partnership agreement was in effect or ended. The premature distribution of the per-

sonal estate, even by a final order, does not preclude a court of equity from making proper adjustment of the rights of the parties. Robertson's Guardian v. Fidelity & Casualty Co. of New York, 227 Ky. 114, 12 S. W. (2d) 298.

The judgment is affirmed on the appeal and reversed on the cross-appeal, with directions to dismiss the action of the appellants against James Oak, and to adjudge Oak his statutory rights in the property, real and personal, of his deceased wife.